# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

MICHAEL ANDERSON PEEK,       )
                                  )
        *Petitioner*,           )
v.                            )          3:04-cv-496
                                  )          *Phillips*
                                  )
                                  )
HOWARD CARLTON, Warden,     )
                                  )
        *Respondent*.       )

## **MEMORANDUM**

This is a petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by petitioner Michael Anderson Peek ("Peek"). The respondent has filed his response to the petition. For the following reasons, the petition for the writ of habeas corpus will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE**.

I.     <u>Standard of Review</u>

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Cases In The United States District Courts, the court is to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. If no hearing is required, the district judge

is to dispose of the case as justice dictates. If the record shows conclusively that Peek is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.    Factual Background

The respondent has provided the court with copies of the relevant documents as to Peek's direct appeal and post-conviction proceedings. [Court File No. 14, Notice of Filing Documents, Addenda 1-4]. Peek was convicted by a jury, in the Circuit Court of Hamilton County, Tennessee, of aggravated rape (four counts), attempted aggravated rape (one count), rape (three counts), aggravated robbery (one count), robbery (two counts), and aggravated burglary (three counts); the convictions involved five victims over a span of 18 months and the cases were tried jointly. Peek was sentenced to an effective sentence of 99 years in prison. The judgments of conviction were affirmed on direct appeal. *State v. Peek*, No. E1998-00038-CCA-R3-CD, 2000 WL 565129 (Tenn. Crim. App. May 3, 2000) [Addendum 2, Document 3], *perm. app. denied, id.* (Tenn. Nov. 13, 2000) [Addendum 2, Document 6].

The Tennessee Court of Criminal Appeals stated the facts against Peek in each case in the following lengthy summary:

**Victim One**

The first victim, T.P., a thirty-one-year-old single mother, testified that she lived in the Hamilton Point Apartments in the East Brainerd area of

2

Chattanooga with her two young sons. On the morning of Wednesday, January 11, 1995, she had awakened her sons as usual, fed them breakfast, and waited with them for the school bus. At about 8:30 a.m., she returned to her apartment and was completing some paperwork in her bedroom when she heard her front door creak open. She walked toward her bedroom door and saw a man standing in the hallway. He wore a bandana over his face and some type of a hat to cover his hair. With his hand in his jacket pocket, he told her not to scream or he would "put a hole in" her. He told her to take off her glasses and turn around. He then went through her dresser until he found some stockings which he used to blindfold her. From that point on, she could see nothing and testified that she could not visually identify her attacker. She did tell him that her sons needed her and that he could take whatever he wanted if he would promise not to hurt her.

After T.P. was blindfolded, she was told to "disrobe" and sit down on the bed. Her attacker then told her to lay down on the bed where he fondled her and told her how pretty she was. He then penetrated her vaginally with his penis and ejaculated.

T.P. also testified that her attacker had asked her to "make love to him like I did my husband." After the rape, he asked if "it was good" for her and said that it "wasn't that good" for him. She chose to say nothing, fearing that if she said the wrong thing, he would kill her. He then went into her closet, took a pair of shoelaces out of her tennis shoes, tied her hands behind her back, and tied her feet. He took money from her purse and from a coin holder on top of the stove. After pulling telephone cords out of the walls, he came back to the bedroom and told her if she wanted to see her sons alive, she would "write this off as a bad experience" and learn to lock her door. He told her that "his boys" were watching her and that if she wanted to see her sons make it home, she would not call the police. Once her attacker had left and she was free, she locked her door and called the police using parts of telephone equipment she could piece together.

T.P.'s testimony was followed by the testimony of three of her neighbors: Patty Shipley, who lived in the apartment diagonally across from the victim; Renee Diane Moton, who lived with her son in the apartment directly across from T.P.; and Sherman Moton, the eleven-year-old son of Moton. Shipley positively identified the defendant as the man she saw outside the apartment building as she was leaving on the morning of January 11, 1995, at approximately 7:15 a.m. The defendant was standing in front of T.P.'s car, "just kind of propped up there." Moton and her son positively identified the

defendant as the man each saw standing at the end of the breezeway outside of the victim's apartment on the morning of January 11, 1995, at approximately 8:00 a.m. The defendant was leaning against a fence at the end of the breezeway and "looking out into the woods." In each case, the defendant and the witnesses had spoken, exchanging common greetings.

T.P. was examined by Dr. Bert Geer at the Erlanger Medical Center, according to police protocol for possible rape victims. Dr. Geer collected samples for a rape kit which were turned over to the Chattanooga Police Department for DNA testing. The victim's medical history and assault information form, a twenty-five question, preprinted form, included T.P.'s identification of the race of her assailant as African-American.

T.P. subsequently listened for approximately fifteen minutes to a tape of an interview between the defendant and Detective Bill Phillips of the Chattanooga Police Department under conditions agreed to by the defendant and the State. T.P. positively identified the voice of the defendant as the voice of her attacker.

The State's expert witness, TBI Agent Joe Minor, testified that the vaginal smears taken from T.P.'s rape kit had been tested at the Tennessee Bureau of Investigation's forensic services division in Nashville. The five-probe DNA test resulted in a DNA profile that matched the specimen obtained from the defendant with a probability of selecting an unrelated individual at random with a matching DNA profile-or the odds that someone other than the defendant would have the same DNA profile-being approximately one in 19,000 in the Caucasian population and approximately one in 22,000 in the African American population. According to Agent Minor's testimony, greater than 99.99 percent of the population could be excluded as being the source of the DNA sample taken from T.P.

Based on these facts, the defendant was convicted of three separate felonies: aggravated rape for the vaginal penetration of the victim while leading the victim to reasonably believe that he had a weapon; aggravated robbery for the theft of money while leading the victim to reasonably believe that he had a weapon; and aggravated burglary for entering a habitation and committing a felony. The sentences, all concurrent for this series of acts, were twenty-five years, twelve years, and six years, respectively.

**Victim Two**

The second victim, K.S., a twenty-three-year-old, also lived at Hamilton Point Apartments but in a different building from T.P. K.S. testified that on December 8, 1995, she was returning home alone from her job at a local restaurant at approximately 2:20 a.m. Because all the parking places in front of her building were taken, she had to park on the side. She locked her car and, carrying her work apron in her hand, walked around to the front of the building when a man emerged from the breezeway. She could tell he was an African American. She was not alarmed, thinking the man was one of her neighbors, until she noticed that he had his face covered. She began to scream as he grabbed her from behind and covered her mouth with his hand. He told her to be quiet or he would hurt her. He steered her over to the side of the building where four air conditioning units were located behind a latticework fence and bushes.

Once they reached a space in the middle between two units, they stopped. K.S. was able to engage the defendant in a discussion of genital warts, which she claimed to have; of her roommate situation; and of the fact that she was menstruating. She testified that his tone with her was "very conversational, very calm, very deliberate, like not a thing in the world is going wrong here." He finally told her to take off all her clothes and be quiet or he would kill her. He allowed her to remove a tampon and then, taking her shoulders, pushed her over one of the units and penetrated her anally. K.S. testified that after the rape was over, the defendant asked for her money and took what he found in the pocket of her pants.

K.S. sought the help of neighbors who called the police. She was taken to the Rape Crisis Center where a rape kit was processed on her and given to the police. K.S. identified the race of her attacker as African-American on the victim's medical history and assault information form completed at the Rape Crisis Center.

On March 14, 1997, K.S. listened to the same voice exemplar that T.P. had heard. K.S. positively identified the voice of the defendant as the voice of the man who raped her.

The State's expert, Agent Minor, testified that the DNA profile from seminal fluid on the work apron used by the defendant to wipe himself after the rape was tested at the TBI laboratory and matched the defendant's with a

Case 3:04-cv-00496   Document 21   Filed 09/05/08   Page 5 of 31   PageID #: 21

probability of selecting an unrelated individual at random being approximately one in 27 billion in the Caucasian population and one in 195 billion in the African-American population.

Based on these facts, the defendant was convicted of rape for the anal penetration of the victim and robbery for the theft of money from the victim's clothing. The sentences, both to be served concurrently, were twelve years and six years respectively. The sentences were ordered to be served consecutively to the twenty-five year sentence for the aggravated rape of T.P. in No. 213109.

## Victim Three

The third victim, G.C., a forty-four-year-old woman, testified that she was a resident of Hidden Creek Apartments, a complex in the same neighborhood as the Hamilton Point Apartments where victims one and two lived. G.C. testified that on Friday, January 26, 1996, at approximately 7:00 p.m., she had parked her car in the apartment lot and was walking toward her building when a man came toward her and then moved behind her and grabbed her, placing his hand over her mouth to prevent her from screaming. He threatened to stab her in the heart, a threat he repeated over the course of the events that followed. He dragged her to the bushes, pushed her down into the mud, and took the money she had in her purse. As she struggled, he dragged and pushed her through dense woods behind the apartment complex.

When they got to a clearing in the woods, the defendant stopped and told G.C. to take off all her clothes. The defendant first made her get on her knees and perform oral sex. Afterwards, he had her cover her eyes with her hands while he pulled his hat over her face so that she could not see. Later, he blindfolded her by tying her turtleneck sweater around her face. He then made her lie down and he penetrated her vaginally, telling her that "[y]ou're supposed to be enjoying this. I mean, act like you're enjoying this. You're supposed to pretend you're enjoying this." The defendant threatened anal rape but did not carry out this threat. Instead, he took laces from G.C.'s boots, tied her hands behind her back, tied her feet in front of her, and left her blindfolded with her own turtleneck.

Once free, G.C. ran into her apartment and called 911. She was taken to the Rape Crisis Center where a rape kit was processed on her and given to the police. She identified her attacker's race as African-American on the

victim's medical history and assault information form completed at the Rape Crisis Center.

G.C. was unable to positively identify the voice on the exemplar as that of her assailant. She did testify that in the moments before the defendant grabbed her on the night of January 26, she recognized him as the same man who had passed her on the walkway just nights earlier, similarly bundled up.

Agent Minor testified that the DNA profile from vaginal swabs taken from G.C.'s rape kit were tested at the TBI laboratory and matched the defendant's profile with a probability of selecting an unrelated individual at random being approximately one in 370,000 in the Caucasian population and one in 777,000 in the African-American population.

Rebecca Adams, who lived in the same apartment complex in the unit beside G.C., testified to the following events of January 24, 1996, just two days before the defendant attacked and raped G.C.:

> It was late at night, I'd been working fairly late and it was after eleven o'clock at night. It was dark out and misty. It had been raining a little bit, I think. And I parked and got my mail and I was carrying two bags in my hand walking towards my apartment, which is on the other side of the parking lot. And as I walked across the parking lot, there was someone standing there in the shadows. It was someone who was wearing a hooded jacket, and, and as I walked towards my apartment complex, that person moved out from behind the shadows and started walking towards me.
>
> And I walked a little bit faster and that person fell in line approaching towards me, walking behind me. And I walked faster and he walked faster, and I could feel that any, within a short amount of time, he was going to be very, very close to me, and I was getting very concerned, and I didn't really know what to do, but I turned around and I said, "Hi, how are you?" And he, he just kind of stumbled. I think I took him a little bit by surprise, and he started-he moved a little bit and continued walking, but moved a little bit out of my direction, and then I just walked up to my apartment as quick as I could.
>
> ....

7

Q.      Okay. Do you, would you be able to recognize the person who was behind you when you, who you greeted?

A.      Yes.

Q.      Can you tell the jury whether or not that person is in the courtroom today?

A.      Yes.

Q.      And for purposes of the record and for the jury, could you identify who that person is?

A.      The person in the blue shirt over there holding his hand up.

Based on these facts, the defendant was convicted of rape for sexually penetrating the victim by fellatio; rape for the vaginal penetration of the victim; and robbery for the theft of money from her purse. The sentences, all to be served concurrently, were twelve years, twelve years, and six years respectively. The sentences were ordered to be served consecutively to the twelve-year sentence for the rape of K.S. in No. 213111.


## Victim Four

The fourth victim, K.T., a twenty-five-year-old single mother of two children, ages three and one, testified that on July 1, 1996, she was living in the downstairs apartment of a duplex she shared with her sister, who lived in the upstairs apartment. The duplex is in the East Lake area of Chattanooga. On this night, K.T. had put her children to sleep on the couch and made a pallet for herself beside them on the floor because it was hot and her apartment had no air conditioning. At some point during the night, she woke up because someone was dragging her through the apartment. He had his hands over her nose and mouth.

K.T. testified that she started fighting and struggling against her attacker until he slammed her against a wall, telling her to stop fighting, and placed a knife to her throat. When she saw her three-year-old daughter in front of her, screaming and crying, she stopped fighting. Her attacker told her to send her daughter back to bed in the living room, and she complied. He then

8

blindfolded her with one of her tee shirts and told her to take her clothes off. She was wearing a tee shirt and shorts and removed her shorts. Her attacker told her, "I hear you do it good, you better, because your life depends on it." He then forced her to perform oral sex on him in her bedroom. He led her back into the hallway, telling her to get down on the floor on her knees, and attempted to have anal sex with her. Instead he penetrated her vaginally, threatening to cut her throat if anyone showed up. Finally, he took her back into her bedroom where he tied her hands behind her back and then tied her feet to her hands, using a vacuum cleaner cord he had cut before the attack started, and leaving her lying on her stomach on her bed, blindfolded. Once he was gone, her three-year-old daughter came and took the blindfold off her mother and United her hands and feet.

K.T.'s sister called the police, and the victim was taken to the Rape Crisis Center. A rape kit was processed on her and turned over to the police. K.T. identified her attacker as an African American male on the victim's medical history and assault information form completed at the Rape Crisis Center.

Agent Minor testified that the vaginal slide and swabs from K.T.'s rape kit were tested at the TBI laboratory and matched the defendant's DNA profile with a probability of selecting an unrelated individual at random with a matching DNA profile-or the odds that someone other than the defendant would have the same DNA profile-being one in 50 million in the Caucasian population and one in 145 million in the African American population.

K.T. also listened to the voice exemplar of the defendant for approximately fifteen minutes. She made a positive identification of the voice of the defendant as that of the man who raped her on July 1, 1996.

On cross-examination, K.T. testified that a few days prior to the attack, the defendant had driven by the duplex she shared with her sister on his motorcycle and spoken to the two sisters while they were sitting on the porch at approximately 11:00 p.m. He did not get off his motorcycle but commented that he had seen them from the gas station across the street and wanted to stop and say hello since he had not seen them for a number of years. K.T. testified that she recognized the defendant as someone she had known slightly some thirteen years earlier when the defendant was dating a woman who lived above her.

9

The events of July 1, 1996, led to four separate convictions: aggravated rape for the vaginal penetration of the victim while leading the victim to reasonably believe that her attacker had a knife; aggravated rape for the oral penetration of the victim while leading the victim to reasonably believe that her attacker had a knife; attempted aggravated rape for the attempted anal rape of the victim; and aggravated burglary for entering a habitation and committing a felony. The sentences for this series of acts were twenty-five years, twenty-five years, twelve years, and six years respectively. The sentences were ordered concurrent with each other, but the two sentences for aggravated rape and the sentence for attempted aggravated rape were ordered consecutive to the twelve-year sentence for the rape of G.C. in No. 213113.

## Victim Five

The fifth victim, G.H., a fifty-one-year-old woman, testified that she lived in her own home also in the East Lake area of Chattanooga. G.H. testified further that she had gone to bed on a pallet in her living room because the air conditioning in her house was not working. When her alarm clock went off at 4:00 a.m. on July 30, 1996, she hit the snooze button and lay back down. Just as she was about to get up, she felt something touch her back. Then someone pushed her back down on her stomach and held something sharp to her neck, threatening to kill her if she did not remain quiet. The attacker blindfolded her with one of her shirts, rolled her over, and told her what he was going to do. G.H. testified to the following:

Q.   What did he tell you he was going to do?

A.   That he was going to have sex, but he was, you know, used vulgar language, so-

Q.   Okay. So he-if you don't mind telling the jury, just tell them specifically what he said?

A.   He told me he was going to fuck me like I'd never been fucked before.

Q.   Okay.

A.   And so then he proceeded to have sex and then he rolled me back over. He asked me-he told me he needed $50. I

10

told him I didn't have any money. And he said he was going to kill me if I didn't give him money. I said, "Well, I don't have any money." So then he tied my hands behind my back and tied my feet, and I just laid there, because he left, I guess, and, you know-

Q.     What were you thinking at that time?

A.     That he was going to kill me.

Q.     And how did he tie you? What did he use to tie you and how did he tie your arms?

A.     My shoe strings.

G.H. testified that her attacker warned her not to call the police. Once she had freed herself, G.H. went next door where neighbors let her in and called her son who came and placed a 911 call to the police.

G.H. was taken to the Rape Crisis Center where a rape kit was processed and given to the police. She was unable to identify the race of her attacker on the victim's medical history and assault information form completed at the Rape Crisis Center. The victim was also unable to positively identify the voice of the defendant on the exemplar as that of her attacker because her attacker whispered. She did note that her attacker had a slight Northern or "proper" accent.

The State's expert witness, Agent Minor, testified that the vaginal swab from G.H.'s rape kit matched the DNA of the defendant with a probability of selecting an unrelated individual at random having a matching DNA profile being approximately one in 276 billion in the Caucasian population and one in 195 billion in the African-American population.

Timothy Daniel Knight testified that he was living with his grandmother in the house next door to the victim at the time of the attack. Knight testified further that in the early morning hours of July 30, 1996, he had gone to a gas station and bought beer. When he came out, he saw the defendant, a man whom he had met a couple of years before through mutual friends, standing in the parking lot of the gas station. The defendant asked Knight for a cigarette; Knight gave him the cigarette and then drove home.

11

Because his grandmother did not allow beer in her house, Knight sat in his car to drink and listen to the car radio. Knight testified he saw the defendant walking down the street and called him to come over and join him in the car for a beer. The time was approximately 2:00 a.m.

The defendant joined Knight in the car. They talked, listened to music, and drank beer for about forty-five minutes. Finally, Knight told the defendant that it was getting late and he had to get up and go to work soon, so Knight went inside his grandmother's house. At that point, it was about 3:15 a.m. Knight did not see where the defendant went.

Based on these facts, the defendant was convicted of aggravated rape for the vaginal penetration of the victim while leading the victim to reasonably believe he had a weapon and aggravated burglary for entering a habitation and committing a felony. The sentences, both to be served concurrently, were twenty-five years and six years, respectively. The twenty-five year sentence was ordered to be served consecutively to the rape sentence for victim four in No. 213117.

*State v. Peek*, 2000 WL 565129 at **2-9 (footnotes omitted).

Peek then filed a petition for post-conviction relief. The post-conviction petition was denied after an evidentiary hearing, and the Tennessee Court of Criminal Appeals affirmed. *Peek v. State*, No. E2003-00449-CCA-R3-PC, 2003 WL 22734616 (Tenn. Crim. App. Nov. 20, 2003) [Addendum 4, Document 3], *perm. app. denied, id.* (Tenn. April 5, 2004) [Addendum 4, Document 5].

In support of his petition for the writ of habeas corpus, Peek alleges the following:

1.      Whether the trial court erred by denying a defense motion to sever the offenses.

2.      Whether the trial court erred by denying a defense motion to suppress evidence obtained pursuant to a search warrant for defendant's blood, saliva and hair.

3.      Whether the trial court erred in requiring the defendant to wear a leg shackle during the trial.

4. Whether the trial court erred in admitting the testimony of Rebecca Adams for identification purposes.

5. Whether the trial court erred in allowing Tennessee Bureau of Investigation Agent Joe Minor to testify as an expert regarding DNA testing and interpretation.

6. Whether prosecutorial misconduct occurred during opening statement.

7. Whether the trial court erred in denying a defense motion for change of venue.

8. Whether the trial court erred as to the length and manner of service of the sentence imposed.

9. Whether Petitioner's counsel's failure to procure an expert to refute the State's expert on DNA evidence constituted ineffective assistance of counsel in violation of Petitioner's rights under the Sixth Amendment to the United States Constitution and Article I Section 9 of the Tennessee Constitution.

The respondent contends Peek is not entitled to habeas corpus relief on the basis of failure to state a cognizable basis for habeas relief, procedural default, or the state court findings.

III. <u>Procedural Default</u>

The doctrine of procedural default is an extension of the exhaustion doctrine. A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must

have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review."). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Peek cannot file another state petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(c). Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

The respondent contends that the majority of Peek's claims fail to state a cognizable claim for habeas corpus relief or are procedurally defaulted. As to those claims not procedurally defaulted, the respondent contends he is entitled to judgment as a matter of law based on the findings of the Tennessee state courts.

IV.    <u>State Court Findings</u>

Pursuant to 28 U.S.C. § 2254(d), Peek may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court. In addition, findings of fact by a state court are presumed correct and Peek must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). Peek has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1). A state court decision is "contrary to"

15

Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413. A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In light of the foregoing standards for review, the court will consider Peek's grounds for the writ of habeas corpus.

V.     Discussion of Claims

   A.     *Whether the trial court erred by denying a defense motion to sever the offenses.*

Peek alleges the trial court's failure to sever the offenses was a violation of Rule 14 of the Tennessee Rules of Criminal Procedure. That rule gives a defendant "the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." *Id.* Rule 14(b).

16

Rule 14(b) was the basis of Peek's motion to sever that was filed in the trial court. [Addendum 1, vol. 1, Technical Record of Direct Appeal, Motion for Severance of Offenses, pp. 72-73]. The trial court considered the motion under the standard set forth in Rule 14(b), found that the offenses were part of a common scheme or plan, and denied the motion to sever. [*Id.*, vol. 2, Transcript of Hearing on Motions, pp. 28-41]. The Tennessee Court of Criminal Appeals considered the issue as a matter of state law and concluded that, although it was error to consolidate the cases for trial, it was harmless error. *State v. Peek*, 2000 WL 565129 at **9-13.

A federal habeas petitioner may obtain relief if he is "in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Peek's allegation that the trial court erred in denying the motion to sever involves the alleged failure of the trial judge to comply with state law requirements. As such, "it is not cognizable in a federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus.").

17

In addition, by raising the issue in the state courts only as a matter of state law, Peek has procedurally defaulted any claim he might have that the failure to sever the offenses violated the U.S. Constitution.

> A federal court will not address a habeas petitioner's federal constitutional claim unless the petitioner has first fairly presented the claim to the state courts. Fair presentation of a federal constitutional issue to a state court requires that the issue be raised by direct citation to federal cases employing constitutional analysis or to state cases relying on constitutional analysis in cases with similar fact patterns.

*Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004) (citations omitted). Accordingly, Peek is not entitled to habeas corpus relief on this claim.

> B. *Whether the trial court erred by denying a defense motion to suppress evidence obtained pursuant to a search warrant for defendant's blood, saliva and hair.*

In his motion to suppress [Addendum 1, vol. 1, Technical Record of Direct Appeal, Motion to Suppress Evidence, pp. 78-80], Peek "attacked the validity of the search warrant obtained by investigating officers to obtain his blood, saliva, and hair samples, claiming that it did not establish probable cause." *State v. Peek*, 2000 WL 565129 at *14. The trial court conducted a hearing on the issue and concluded that the search warrant was supported by probable cause. [Addendum 1, vol. 2, Transcript of Hearing on Motions, pp. 17-28]. The Tennessee Court of Criminal Appeals affirmed, after a lengthy discussion of the issue.

> The affidavit given to support the issuance of the search warrant meets the requirements of the United States Constitution, the Tennessee Constitution, and the common law rules created by the appellate courts of this state. The

18

> affidavit recites in minuscule detail the nature of the crimes the appellant is
> alleged to have committed, the steps taken during the course of the
> investigation, and the information received from the independent witnesses
> having knowledge of the facts. The affidavit was clearly sufficient to justify
> the issuance of the search warrant.

*State v. Peek*, 2000 WL 565129 at *20.

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id*. at 494. The basis for that ruling is that, although "[t]he exclusionary rule was a judicially created means of effectuating the rights secured by the Fourth Amendment," *id*. at 482, "the rule is not a personal constitutional right." *Id*. at 486. *Accord, Kuhlmann v. Wilson*, 477 U.S. 436, 446 (1986); *Jennings v. Rees*, 800 F.2d 72, 75 (6th Cir. 1986).

It is clear, after a review of the record, that Peek's Fourth Amendment claims were fully and fairly litigated in the Tennessee courts. Accordingly, he is not entitled to habeas corpus relief on his claim that the trial court should have granted the motion to suppress.

> C.     *Whether the trial court erred in requiring the defendant to wear a leg shackle*
>        *during the trial.*

At the beginning of the trial, Peek's attorney asked that Peek's leg restraints be removed. The trial court refused and instead observed that the draping over both counsel tables prevented the jury from seeing Peek's legs. [Addendum 1, vol. 3, Transcript of the

Evidence, pp. 8-10]. The trial court did not, however, state on the record the reason why

Peek needed to be shackled during trial. For that reason, the Tennessee Court of Criminal

Appeals held "that the trial court erred in failing to state on the record any clear showing of

necessity for leg shackles." *State v. Peek*, 2000 WL 565129 at *21.

The appellate court considered the issue under the U.S. Constitution, after observing

that "'[o]ne of the essential due process safeguards that attends the accused at his trial is the

benefit of the presumption of innocence....'" *Id.* at 20 (quoting *Estelle v. Williams*, 425 U.S.

501, 517 (1976)). The court further noted that "'[t]he sight of shackles and gags might have

a significant effect on the jury's feelings about the defendant,' and they should be used as a

last resort." *Id.* (quoting *Illinois v. Allen*, 397 U.S. 337, 344 (1970)). Nevertheless, the

Tennessee Court of Criminal Appeals also held that the error was harmless under the

standard established in *Chapman v. California*, 386 U.S. 18, 24 (1967) (a constitutional error

discovered on direct review may be held harmless only if it is harmless beyond a reasonable

doubt).

> In this case, the record shows that precautions were taken by the trial
> court to assure that the members of the jury had no opportunity to see that the
> defendant was restrained in leg shackles. Cloths extending to the floor covered
> both the State and defense tables, and the tables were repositioned so that the
> defense table faced the jury box, alleviating any chance that a juror might see
> behind the defense table. The defendant is unable to provide the court with any
> specific incidence when he was seen in leg shackles by any member of the
> jury. Given the strength of the State's case, we hold that no prejudice to the
> defendant occurred as the result of the trial court's error in failing to comply
> with proper procedures for employment of shackles such as to put into
> question the validity of the outcome of this trial.

*State v. Peek*, 2000 WL 565129 at *22 (footnotes omitted).

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court held that the *Chapman* standard does not apply on collateral review of a state-court judgment; instead, "the more forgiving standard of review applied to nonconstitutional errors on direct appeal from federal convictions" applies. Under that standard, an error is harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 631. The weight of the State's evidence of guilt is a factor to be considered. *Id*. at 639.

This court has reviewed the transcript of Peek's trial. [Addendum 2, vol. 3-7, Transcript of the Evidence, pp. 1-682]. As the appellate court noted, the case against Peek was strong and there is nothing in the record to suggest that the jurors actually saw Peek's leg restraints. Under the circumstances, this court finds that the trial court's error did not have a substantial and injurious effect on the jury's verdict. The state court's findings in that regard are supported in the record and are neither contrary to, nor did they involve an unreasonable application, of federal law under the standard established in *Brecht*. Peek is not entitled to habeas relief on this claim.

> D.      *Whether the trial court erred in admitting the testimony of Rebecca Adams for identification purposes.*

Rebecca Adams testified to seeing Peek at the same apartment complex where the third victim lived two days before that rape occurred. Peek unsuccessfully objected to the admissibility of Ms. Adams' testimony pursuant to Rule 404(b) of the Tennessee Rules of

Evidence. [Addendum 1, vol. 6, Transcript of the Evidence, pp. 331-38]. The Tennessee Court of Criminal Appeals noted that "[i]n his fourth issue, the defendant asserts that the trial court erred in admitting the testimony of Rebecca Adams pursuant to Tennessee Rules of Evidence 404(b)." *State v. Peek*, 2000 WL 565129 at *22. The appellate court likewise considered the issue under the Rule 404(b) and found that "[t]he probative value of Adams's testimony far outweighed any unfair prejudice to the defendant, and the trial judge did not err in admitting her testimony." *Id.*

Peek's claim regarding Ms. Adams' testimony involves the alleged failure of the trial judge to comply with state law and thus is not cognizable in federal habeas proceedings. In addition, by raising the issue in the state courts only as a matter of state law, Peek has procedurally defaulted any claim he might have that the admission of Ms. Adams' testimony violated the U.S. Constitution. Peek is not entitled to habeas corpus relief on this claim.

E.    *Whether the trial court erred in allowing Tennessee Bureau of Investigation Agent Joe Minor to testify as an expert regarding DNA testing and interpretation.*

Peek unsuccessfully objected to the admissibility of Agent Minor's testimony as an expert witness. [Addendum 1, vol. 6, Transcript of the Evidence, p. 437]. The Tennessee Court of Criminal Appeals noted that "[t]he admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. The qualification of a witness as an expert is left to the sound discretion of the trial court." *State v. Peek*, 2000 WL 565129 at *23 (citations

22

omitted). The appellate court then concluded that Agent Minor's testimony was proper under Rule 702, which sets out the principles for admitting scientific or technical evidence. "We conclude that the requirements of Rule 702 were fully satisfied, and that the trial judge's admission of Agent Minor as an expert witness was not an abuse of discretion." *Id.*

Peek's claim regarding Agent Minor's testimony as an expert witness involves the alleged failure of the trial judge to comply with state law and thus is not cognizable in federal habeas proceedings. In addition, by raising the issue in the state courts only as a matter of state law, Peek has procedurally defaulted any claim he might have that the admission of Mr. Minor's testimony violated the U.S. Constitution. Peek is not entitled to habeas corpus relief on this claim.

F.    *Whether prosecutorial misconduct occurred during opening statement.*

Peek's allegations of prosecutorial misconduct were summarized and rejected by the Tennessee Court of Criminal Appeals as follows:

> In his sixth issue, the defendant argues that the prosecutor committed prosecutorial misconduct in his opening statement by becoming a witness himself and, additionally, by commenting on the fact that the defendant could not call a witness to dispute the general reliability of DNA evidence today.
>
> ...
>
> As to the prosecutor's becoming a witness, the defendant asserts that the prosecutor testified to the fact that he was an expert in DNA analysis. The defendant points to no specific statement in the record to support this allegation and we find none. The defendant's reliance on *State v. Smith*, 803 S.W.2d 709 (Tenn. Crim. App.1990), is misplaced since in that case the

prosecutor took part in a demonstration, yet because of his status, he was not subject to cross-examination. In this case, the opening statement of the prosecutor appropriately discussed the importance of DNA evidence to the State's case. The State's expert witness was fully cross-examined by the defense concerning DNA evidence. Further, the trial court noted the following at the hearing on defense motion for a new trial:

> And about the prosecutorial misconduct of Lee Davis, of course, I always charge the jury, and I told them before the trial started and after, that statements by attorneys and even the questions that attorneys make are not evidence, and so I don't find that Lee Davis made any, was guilty of any misconduct.

We agree that the allegation that the prosecutor essentially became a witness for the State is without merit.

The defendant further contends that the prosecutor acted improperly by stating that the defense would not call any witnesses who would disagree with the reliability of DNA evidence. The prosecutor stated in opening argument to the jury:

> There will be no one-I suggest to you it doesn't matter who the defense calls, there will be no one who will take that witness stand and tell you you can't believe DNA. If they choose to call someone-and they don't have to, I'll make that clear, they don't have to, they have absolutely no obligation to-but should they choose to, no one will, in this day and age, take the witness stand and say what they said about fingerprints, you know, in 1892, You can't trust them. There'll be nobody, because we've evolved past that point. In the last ten years, we have seen DNA do amazing things.

The general reliability of DNA evidence has been determined by the legislature in Tennessee Code Annotated § 24-7-117. Therefore, the prosecutor was making an observation that is undisputed. The prosecutor also made it clear that the defense was under no obligation to present any evidence at all. We note further that this case was not a close one but one where the evidence of the defendant's guilt was substantial. We conclude that this issue is without merit.

*State v. Peek*, 2000 WL 565129 at **23-24 (footnote omitted).

24

For a petitioner to obtain habeas corpus relief, "the prosecutor's statements must be so egregious as to render the trial fundamentally unfair.  This determination is to be made by evaluating the totality of the circumstances surrounding each individual case."  *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).  *See also United States v. Payne*, 2 F.3d 706, 712 (6th Cir. 1993) ("If the court finds prosecutorial misconduct, the court must then consider whether, on the entire record, the misconduct can be said to be harmless.  To deny a defendant a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial.'") (quoting *United States v. Vance*, 871 F.2d 572, 577 (6th Cir. 1989)).

In *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994), the Sixth Circuit constructed a framework for reviewing claims of prosecutorial misconduct.  In a later case, the court succinctly explained the framework of *Carroll* as follows:

> First, the court should determine if the prosecutor's statements were improper.  Then, if the statements were improper, the court must determine if the impropriety was flagrant.  To determine flagrancy, the court should consider four factors:
>
> > (1) whether the remarks tended to mislead the jury or to prejudice the accused [including whether the trial judge gave an appropriate cautionary instruction to the jury];
> >
> > (2) whether they were isolated or extensive;
> >
> > (3) whether they were deliberately or accidentally placed before the jury; and
> >
> > (4) the strength of the evidence against the accused.

*United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir. 1996) (citations omitted).

As noted, this court has reviewed the transcript of Peek's trial. The court agrees with the state courts that the prosecutor's remarks were not improper. Even if the remarks were improper, they were not so egregious as to have rendered the trial fundamentally unfair. The state court's findings in that regard are supported in the record and are neither contrary to, nor did they involve an unreasonable application, of established federal law. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974) (in evaluating a claim of prosecutorial misconduct, the court should determine whether the prosecutor's remarks made the defendant's "trial so fundamentally unfair as to deny him due process"). Peek is not entitled to habeas corpus relief on this claim.

G.    *Whether the trial court erred in denying a defense motion for change of venue.*

Peek filed a motion for change of venue based upon extensive media coverage of the cases. [Addendum 1, vol. 1, Technical Record of Direct Appeal, Motion for Change of Venue, pp. 67-71]. The trial court denied the motion. [*Id.*, vol. 2, Transcript of Hearing on Motions, pp. 15-16]. The Tennessee Court of Criminal Appeals considered the issue under state law and found it lacked merit. *State v. Peek*, 2000 WL 565129 at *25.

Peek's claim regarding the failure to grant a change of venue involves the alleged failure of the trial judge to comply with state law and thus is not cognizable in federal habeas proceedings. In addition, by raising the issue in the state courts only as a matter of state law,

Peek has procedurally defaulted any claim he might have that the refusal to change venue violated the U.S. Constitution. Peek is not entitled to habeas corpus relief on this claim.

H.     *Whether the trial court erred as to the length and manner of service of the sentence imposed.*

Peek was sentenced pursuant to the guidelines set forth in the Criminal Sentencing Reform Act of 1989, Tenn. Code Ann. §§ 40-35-101 *et seq.* His claims regarding his sentence is based upon Tennessee state law principles and thus is not cognizable in federal habeas proceedings. Peek is not entitled to habeas corpus relief on this claim.

I.     *Whether Petitioner's counsel's failure to procure an expert to refute the State's expert on DNA evidence constituted ineffective assistance of counsel in violation of Petitioner's rights under the Sixth Amendment to the United States Constitution and Article I section 9 of the Tennessee Constitution.*

In *Strickland v. Washington*, 466 U.S. 668 (1984) the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), Peek must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id.* at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id.* at 691-92.

Peek alleged several incidents of ineffective assistance of counsel in his post-conviction petition. The only claim pursued on appeal, however, and thus the only claim considered by the Tennessee Court of Criminal Appeals, was the one that Peek now raises in his petition for the writ of habeas corpus. In considering Peek's claim of ineffective assistance of counsel, the Tennessee Court of Criminal Appeals noted that *Strickland v. Washington* established the standard for evaluating such claims. *Peek v. State*, 2003 WL 22734616 at *12. The appellate court then summarized the evidence presented at the evidentiary hearing and found as follows:

During the post-conviction hearing, both Gothard and Co-Counsel testified that Counsel filed a motion requesting a DNA expert for the Petitioner and obtained the services of Dr. Shields.[1] Co-Counsel testified that Dr. Shields reviewed the State's DNA analysis and concluded that the analysis contained no errors or irregularities. Co-Counsel stated that because Dr. Shields found no errors in the State's DNA analysis, he and Counsel did not file a motion with the trial court to have the samples retested in another lab. Co-Counsel explained that he and Counsel decided that they would not call Dr. Shields to testify because he would not help the Petitioner's case. Co-Counsel stated that he met with Dr. Shields the day before the Petitioner's trial in order to decide whether the expert would testify and to prepare to cross-examine the State's DNA expert. Co-Counsel also testified that he studied two DNA treatises to prepare to cross-examine the State's DNA expert. Moreover, Co-Counsel stated that he vigorously cross-examined the State's DNA expert regarding his qualifications and his analysis of the Petitioner's DNA and the samples obtained from the victims.

After thoroughly reviewing the evidence from the post-conviction hearing, we conclude that both Counsel's performance and Co-Counsel's performance in defending the Petitioner "fall[ ] within the wide range of reasonable professional assistance." Furthermore, the Petitioner failed to prove that either Counsel's performance or Co-Counsel's performance prejudiced his defense, resulting in a failure to produce a reliable result. Indeed, contrary to the Petitioner's assertions, the evidence showed that Counsel and Co-Counsel procured a highly qualified DNA expert to review the State's DNA analysis and help prepare for the cross-examination of the State's DNA expert. Therefore, we conclude that the Petitioner has failed to prove ineffective assistance of counsel by clear and convincing evidence, and the post-conviction court did not err by finding that the Petitioner received effective assistance of counsel and dismissing his petition.

*Id*. (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)) (other citations omitted).

---

[1] Peek was represented at trial by Bill Dobson ("Counsel") and Rich Heinsman ("Co-Counsel"), both of whom worked for the public defender's office. Karla Gothard, executive assistant district public defender, was their supervisor. *Peek v. State*, 2003 WL 22734616 at ** 8-9. Mr. Dobson passed away a short time prior to the hearing on the petition for post-conviction relief. [Addendum 3, Transcript of Hearing on Petition for Postconviction Relief, p. 3].

This court has reviewed the record of Peek's post-conviction proceedings [Addendum 3, Transcript of Hearing on Petition for Postconviction Relief, pp. 1-82]; the findings of the Tennessee courts are supported by the record.

Ms. Gothard testified that the defense filed a motion requesting appointment of an expert in DNA analysis; the motion was granted and Dr. William Shields, whom Ms. Gothard considered one of the foremost DNA experts in the country, was appointed. [*Id*. at 40 -41]. Dr. Shields reviewed the DNA evidence; he would not have tested the evidence unless he found a reason for retesting. [*Id*. at 42].

Mr. Heinsman testified that Dr. Shields was available as a potential witness at trial, but the defense chose not to call him because the defense concluded they would be more successful in cross-examining the State's witness than in using their own in rebuttal. [*Id*. at 55-56]. According to Mr. Heinsman, Dr. Shields' testimony would have supported the testimony of the State's witness. [*Id*. at 56]. Mr. Heinsman agreed with Ms. Gothard that Dr. Shields did not recommend retesting the DNA evidence. [*Id*. at 68].

Based upon the foregoing, this court concludes that the state courts' determinations that Peek received the effective assistance of counsel were neither contrary to, nor did they involve an unreasonable application of, federal law as established by the Supreme Court in *Strickland v. Washington*.

VI.    Conclusion

The petition for habeas corpus relief will be **DENIED** and this action **DISMISSED**. Rule 4 of the Rules Governing Section 2254 Cases In The United States District Courts. Peek having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure. The court will further **DENY** Peek leave to proceed *in forma pauperis* on appeal.


**AN APPROPRIATE ORDER WILL ENTER.**


_____s/ Thomas W. Phillips_____
United States District Judge